Corey Page (CSB# 218789)
cpage@evansandpage.com
Geneva Page (CSB# 235633)
gpage@evansandpage.com
Matthew Hamity (CSB# 303880)
mhamity@evansandpage.com
EVANS & PAGE
2912 Diamond Street #346
San Francisco, CA 94131
ph:  (415) 896-5072
fax:  (415) 358-5855

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIELLE WILLIAMSON, by and through her father, BENNETT WILLIAMSON, for herself and on behalf of ANIMAL AWARENESS CLUB, a student organization; PHYSICIANS COMMITTEE FOR RESPONSIBLE MEDICINE, a nonprofit membership organization, <br><br> Plaintiffs <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE; LOS ANGELES UNIFIED SCHOOL DISTRICT; JOSE P. HUERTA, Region East Superintendent of Los Angeles Unified School District; TONY CORTEZ, Administrator for Eagle Rock/Highland Park Community of Schools, Los Angeles Unified School District; DEREK STEINORTH, Principal of Eagle Rock Junior/Senior High School, Los Angeles Unified School District, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND NOMINAL DAMAGES** |

**Introduction**

1.      Plaintiff Marielle Williamson ("Marielle" or "Plaintiff Williamson") brings this action as a student and advocate for the health and well-being of children, animals, and the environment. Marielle seeks to protect her First Amendment right to peacefully engage in student speech that exposes the harms caused by consuming dairy products.

2.      Marielle requested her school's permission to distribute, while directly outside of the cafeteria, literature that described the health and equity problems associated with serving dairy milk to students. In particular, she sought confirmation that such advocacy would not violate the National School Lunch Program ("NSLP") provision that bars a school, or a person approved by the school, from directly or indirectly restricting the sale or marketing of dairy milk on school premises.

3.      District Defendants, defined *infra*, responded by prohibiting Marielle from distributing literature critical of dairy unless she simultaneously distributed promotional material published by the dairy industry ("Dairy Promotions").

4.      By compelling Marielle to simultaneously distribute the dairy misinformation that she seeks to refute, District Defendants have violated Marielle's free speech rights. More than that, the District Defendants have laid bare the extent to which Defendant United States Department of Agriculture ("USDA") treats dairy as sacrosanct, both as a matter of law and policy, whereby schools participating in the NSLP must violate a student's constitutional rights in the interest of preventing the student from "indirectly restrict[ing] the marketing of dairy milk."

5.      The Supreme Court of the United States has acknowledged that such compelled speech results in the loss of the speaker's freedom:

> If "the government [were] freely able to compel . . . speakers to propound political messages with which they disagree, . . . protection [of a speaker's freedom] would be empty, for the government could require speakers to affirm in one breath that which they deny in the next."

*Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (plurality opinion).

6.      The Physicians Committee for Responsible Medicine ("Physicians Committee") joins Marielle in this action, having had the privilege to work with dedicated Physicians Committee student members, like Marielle, as well as parent members and physician members, to educate the public about the harms

1   associated with consuming dairy products.

2

3                               **Jurisdiction and Venue**

4   7.      This action arises under the First and Fourteenth Amendments to the United States Constitution,

5   pursuant to 42 U.S.C. § 1983.

6   8.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7   9.      Federal Rule of Civil Procedure 57, and 28 U.S.C. § 2201 empower Plaintiffs to seek, and this

8   Court to enter, the requested declaratory judgments.

9   10.     Federal Rule of Civil Procedure 65, and the Court's inherent equitable powers, empower

10  Plaintiffs to seek, and this Court to enter, the requested injunctive relief.

11  11.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including reasonable

12  attorneys' fees, under 42 U.S.C. § 1988.

13  12.     This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28

14  U.S.C. § 1367.

15  13.     Venue is proper under 28 U.S.C. § 1391 because District Defendants' acts in violation of the

16  United States Constitution have arisen and continue to arise in the Central District of California.

17

18                                    **Parties**

19  14.     Marielle is a 17-year-old student at Eagle Rock Junior/Senior High School ("Eagle Rock

20  School"), within the Eagle Rock/Highland Park Community of Schools, in Region East, under the

21  jurisdiction of the Los Angeles United School District ("LAUSD"). Marielle brings this action by and

22  through her father, Bennett Williamson.

23  15.     Marielle is the President of the Eagle Rock School Animal Awareness Club ("Awareness Club"),

24  a registered student club at Eagle Rock School that aims to make the world a better place by protecting

25  animals and the environment. The Awareness Club has other members, one of whom is a junior.

26  16.     The Awareness Club was approved in January 2023 by class officers and the faculty club

27  manager. Its mission is "[t]o highlight the lesser-known effects our food choices have on animals and

28  ourselves."

                                         3

17.     The Awareness Club meets every Tuesday in the classroom of a permanent faculty sponsor.

18.     In keeping with its mission, members of the Awareness Club would like to engage in speech critical of dairy on schoolgrounds during this school year and subsequent years, but reasonably fear that District Defendants would take adverse action against them.

19.     Marielle is also a student member of the Physicians Committee and a participant in the Physicians Committee's "Truth or Dairy" campaign.

20.     Prior to participating in the "Truth or Dairy" campaign, Marielle conducted research via news articles, scientific publications, and documentaries, through which she learned about dairy's negative impacts on public health, animal welfare, and the environment.

21.     Marielle was selected as the sole winner of the Vegan Teens Are The Future Scholarship based on her essay detailing her dedication to advocacy, her plans to study food science to create sustainable, affordable animal product alternatives, and her commitment to continuing to serve as a voice for the animals.

22.     As an International Baccalaureate diploma student, Marielle has produced scholarship on the impact that animal-derived food products have on climate change and human health, with a particular emphasis on the ways in which government entities subsidize and otherwise promote the dairy industry.

23.     Last year, Marielle testified before a California State Senate Committee in support of California's Child Nutrition Act of 2022 (AB 558), which aimed to incentivize schools to provide more plant-based, climate-friendly lunches in schools.

24.     Plaintiff the Physicians Committee is a nonprofit membership organization headquartered at 5100 Wisconsin Ave., NW, Suite 400, Washington, DC 20016. Established in 1985, the Physicians Committee is a national organization representing nearly 1 million members and supporters, including 17,000 physicians. Approximately 78,000 of these members reside in California. The Physicians Committee advocates for preventive medicine through proper nutrition, encourages higher standards for ethics and effectiveness in medical research, and conducts clinical research on the relationships between food and disease.

25.     Since 2001, the Physicians Committee has issued a periodic "School Lunch Report Card," analyzing the nutritional quality of the menus offered by the largest school districts participating in the

NSLP. California school districts appear in all editions of the School Lunch Report Card.

26.     In 2004, the Physicians Committee initiated its related "Golden Carrot Awards" program to recognize food service professionals who make an exceptional effort to improve the healthfulness of school lunches. The Golden Carrot Awards program has recognized improvements in various California school districts.

27.     In 2017, the Physicians Committee testified before the LAUSD Board of Education in support of a student's proposed pilot program to serve healthful lunches in LAUSD schools.

28.     That same year, the Physicians Committee sued the California Department of Education, seeking a writ of mandate directing the Department to "develop and maintain nutrition guidelines for school lunches and breakfasts, and for all food and beverages sold on public school campuses," as required by California Education Code Section 49531.1.

29.     When the Department thereafter initiated a rulemaking process, the Physicians Committee participated in both subsequent public comment periods, urging the Department to require schools to offer plant-based milks at all times without a formal written request because the "majority of California public school students—72.3 percent"—are members of demographic groups who experience difficulty digesting dairy milk.

30.     In 2019, the Physicians Committee co-sponsored the Healthy, Climate-friendly School Lunch Act (AB 479), a California bill proposing to provide extra funding to schools that add or increase the number of plant-based milks on their menus.

31.     In 2022, the Physicians Committee co-sponsored the Child Nutrition Act of 2022.

32.     Many of the Physicians Committee's members joined the organization to obtain adequate representation of their interest in a safe and healthful diet free from risks, including in schools.

33.     The Physicians Committee brings this action on behalf of its parent and student members and to safeguard its own organizational interest in protecting the right to educate students, administrators, and communities regarding the adverse health and equity impacts of dairy, as well as raise awareness about the obstacles imposed by USDA upon student participants in the NSLP who do not wish to consume dairy milk. The interests of the Physicians Committee and its members in eating a healthful, safe diet are harmed by Defendants' restrictions of student speech critical of dairy, as student members continue to

1  face difficulties obtaining dairy milk substitutes yet are chilled from speaking out about it.

2  34.      The Physicians Committee has partnered with Marielle and other student members and parents in

3  California, including in the LAUSD, as a part of its Truth or Dairy campaign, which aims to raise

4  awareness about the health and equity problems associated with serving dairy milk in schools.

5  35.      The Truth or Dairy campaign works with students and parents to urge schools to display posters

6  and distribute outside the cafeteria educational materials that highlight the benefits of a plant-based diet.

7  36.      Student members have expressed a reasonable concern that participating in the Truth or Dairy

8  campaign could lead to punitive action taken by their schools, in light of District Defendants' restriction

9  of Plaintiff Williamson's speech critical of dairy.

10 37.      Physicians Committee student members would like to engage in speech critical of dairy on

11 school grounds during this school year and subsequent years but reasonably fear that their respective

12 school districts (including LAUSD), would take punitive action against them, and/or Defendant USDA

13 would take adverse action against their respective school districts.

14 38.      Defendants have frustrated the Physicians Committee's organizational mission, forced it to

15 expend resources refuting dairy misinformation in schools, and impaired its ability to adequately

16 represent the interests of its members.

17 39.      Defendant USDA is, and was at all times relevant herein, a federal agency with authority over

18 our nation's agriculture and child nutrition programs, inclusive of the NSLP.

19 40.      Defendant LAUSD is, and was at all times relevant herein, a unified school district organized

20 and operating pursuant to laws of the State of California.

21 41.      Defendant Jose P. Huerta is, and was at all times relevant herein, the Superintendent of Region

22 East of LAUSD and acted within the course and scope of his authority as Superintendent. Defendant

23 Huerta is being sued in his official capacity for injunctive and declaratory relief, and in his individual

24 capacity for nominal damages.

25 42.      Defendant Tony Cortez is, and was at all times relevant herein, the Administrator for Eagle

26 Rock/Highland Park Community of Schools and acted within the course and scope of his authority as

27 Administrator. Defendant Cortez is being sued in his official capacity for injunctive and declaratory

28 relief, and in his individual capacity for nominal damages

43.     Defendant Derek Steinorth is, and was at all times relevant herein, the Principal of Eagle Rock School and acted within the course and scope of his authority as Principal. Defendant Steinorth is being sued in his official capacity for injunctive and declaratory relief, and in his individual capacity for nominal damages.

44.     Defendants LAUSD, Huerta, Cortez, and Steinorth are referred to collectively as "District Defendants."

## Legal Background and Framework

*National School Lunch Program Prohibitions of Restrictions on Sale and Marketing of Milk*

45.     The National School Lunch Act established the NSLP, a federally assisted meal program operating in public and nonprofit private schools and other institutions. *See generally* 42 U.S.C. §§ 1751–1769j.

46.     Defendant USDA oversees the program, which state agencies administer at the state level pursuant to agreements with USDA. 42 U.S.C. §§ 1753, 1757.

47.     For each eligible meal they serve, participating school districts and independent schools receive cash reimbursements that originate as federal appropriations paid to the administering state agencies and then are disbursed to schools. *See* 42 U.S.C. §§ 1752–1753, 1756–1757.

48.     Schools that participate in the NSLP "shall offer students a variety of fluid milk." 42 U.S.C. § 1758(a)(2)(A)(i).

49.     "Fluid milk" is implicitly defined as a dairy beverage made from "cow's milk." *See* 42 U.S.C. § 1758(a)(2)(B)(i).

50.     Students must receive substitutes for dairy milk only if they provide a written statement from "a licensed physician that identifies a disability that restricts the student's diet and that specifies the substitute for fluid milk." Students may, at the school's discretion, receive substitutes for dairy milk if they provide a written statement from a parent, legal guardian, or medical authority that "identifies the medical or other special dietary need that restricts the student's diet." 42 U.S.C. §§ 1758(a)(2)(A)(iii), (a)(2)(B).

51.     Participating schools "shall not directly or indirectly restrict the sale or marketing of fluid milk products by the school (or by a person approved by the school) at any time or any place (i) on the school premises; or (ii) at any school-sponsored event." 42 U.S.C. § 1758(a)(2)(C).

52.     Consistent with 42 U.S.C. § 1758(a)(2)(C), USDA regulations state, "A school participating in the Program, or a person approved by a school participating in the Program, must not directly or indirectly restrict the sale or marketing of fluid milk [] at any time or in any place on school premises or at any school-sponsored event." 7 C.F.R. § 210.10 (d)(4).

53.     USDA may fine participating schools for failure to comply with 42 U.S.C. § 1758(a)(2)(C) and 7 C.F.R. § 210.10 (d)(4) (referred to hereinafter collectively as "Milk Marketing Protections"). *See* 42 U.S.C. § 1769c.

*USDA and the Dairy Industry Monitor School Activities to Ensure Materials Do Not Deter Milk Sales*

54.     USDA relies on the Milk Marketing Protections to prohibit signs in cafeterias that may discourage students from taking milk at the lunch counter.

55.     USDA also relies on the Milk Marketing Protections to discourage students from being offered water during lunch if it may deter them from taking milk.

56.     Though potable water must be available and accessible to children during meals, 7 C.F.R. 210.10(a)(1)(i) and 7 C.F.R. 210.10(d)(4), USDA guidance drafted at the behest of the dairy industry warns school food directors that "[w]hile water must be made available, schools must not directly or indirectly restrict the sale or marketing of fluid milk [citing the Milk Marketing Protections]." Food & Nutrition Serv., USDA, Clarification on the Milk and Water Requirements in the School Meal Programs (2019), https://www.fns.usda.gov/cn/clarification-milk-and-water-requirements-school-meal-program.

57.     USDA's manual for evaluating school food service programs states that "program operators are not to promote or offer water or any other beverage as an alternative selection to fluid milk throughout the food service area." Food & Nutrition Serv., USDA, Administrative Review Manual SY 2018-2019 74, 175 (2018), https://www.fns.usda.gov/nslp/administrative-review-guidance-and-tools.

58.     Dairy industry representatives are in regular contact with USDA officials to ensure that cafeteria signs, layout, and the marketing of other beverages do not detract from the promotion of milk.

8

59.     The dairy industry monitors schools for alleged "violations" of the Milk Marketing Protections, specifically, schools displaying signs and other materials that might prompt students to reconsider taking milk and have encouraged USDA regional offices to "canvas[sic] with State Agencies to increase monitoring of the beverage marketing practices across the nation." For example, an email from Ruth Dyk Saunders, the Vice President of Policy and Legislative Affairs for the International Dairy Foods Association, relayed to USDA a list of geographic areas and school districts where dairy processors reported "both written signage and verbal instructions [that] restrict kids from taking milk." Another internal USDA message reads, "[A] Dairy Association in the Midwest has contacted the Under Secretary's Office with concerns about a vendor offering water in competition with milk. See the attached pictures that they provided. The schools where the pictures were taken are in Oklahoma and Kansas . . . ."

60.     In response to concerns from the dairy industry, USDA appears to have issued warnings or demanded focused reviews of the "offending" signage by the Kansas and Oklahoma state agencies administering the NSLP.

61.     In 2020, the Florida agency responsible for administering the NSLP in that state concluded that the Milk Marketing Protections forbid schools from distributing materials critical of dairy "at any time or in any place on school premises or at any school-sponsored event," inclusive of a school's educational curriculum and instruction. The Florida agency concluded that providing students with posters, brochures, and classroom lessons detailing the negative impacts of dairy consumption on human health, the environment, and animal welfare constituted "negative marketing information about dairy consumption . . . [that] in effect, directly discourages students from selecting fluid milk as a food component. 7 C.F.R. § 210.10(d)(4) explicitly prohibits displaying such marketing materials because it would directly or indirectly restrict the sale or marketing of fluid milk at the school."

62.     That conclusion can be traced directly to USDA. In an April 2020 email, a USDA official informed the Florida state agency that providing "materials for students on the perceived harmful consequences of the consumption of cow's milk" represents "a direct attempt to restrict the sale or marketing of fluid milk products" under the Milk Marketing Protections.

9

63.     Taken as a whole, USDA and dairy industry monitoring of schools has resulted in a policy under which speech critical of dairy on school premises or at any school-sponsored event runs afoul of the Milk Marketing Protections and could result in censure from USDA. The schools, in turn, apply the Milk Marketing Protections by limiting the speech of students like Marielle.

*Students' First Amendment Right to Free Speech Under the United States Constitution*

64.     Students do not shed their First Amendment right to free speech at the schoolhouse gate. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("*Tinker*"). As the Supreme Court of the United States has emphasized, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 603 (1967).

65.     By the same token, "the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This right extends to students in the school context. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868 (1982) ("[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members.").

66.     Student speech on school grounds may be restricted only if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker*, 393 U.S. at 513.

67.     Under *Tinker*, a permissible restriction of student speech "requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001).

68.     "When [a student] is in the cafeteria . . . [s]he may express h[er] opinions, even on controversial subjects . . . ." *Tinker* at 512–13.

69.     "'Since *all* speech inherently involves choices of what to say and what to leave unsaid,' one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (emphasis in original), citing *Pacific Gas & Electric Co.*, 475 U.S. at 11.

70.     Outside the context of commercial advertising, the state "may not compel affirmance of a belief with which the speaker disagrees." *Hurley*, 515 U.S. at 573.

71.     If "the government [were] freely able to compel . . . speakers to propound political messages with which they disagree, . . . protection [of a speaker's freedom] would be empty, for the government could require speakers to affirm in one breath that which they deny in the next." *Pacific Gas & Electric Co.*, 475 U.S. at 16; *see also Hurley*, 515 U.S. at 575 (noting that "[w]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised.").

*Students' Right to Free Speech in the State of California*

72.     Article I, section 2, subdivision (a) of the California Constitution guarantees that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

73.     "The California Constitution's free speech provision is 'at least as broad' as and in some ways is broader than the comparable provision of the federal Constitution's First Amendment." *Kasky v. Nike, Inc.* 27 Cal.4th 939, 958–959 (2002); *see also Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468, 511–13 (2000) (discussing, in a compelled speech case, the broad language of California's free speech clause as a persuasive reason not to follow federal First Amendment precedent).

74.     "Pupils of the public schools [] shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards, the distribution of printed materials or petitions, the wearing of buttons, badges, and other insignia . . . except that expression shall be prohibited which is obscene, libelous, or slanderous." Cal. Educ. Code § 48907(a).

75.     Section 48907 of the California Education code provides greater freedom of speech protections than those guaranteed by the First Amendment and federal case law. *Lopez v. Tulare Joint Union High Sch. Dist.*, 34 Cal. App. 4th 1302, 1317 (1995), *as modified* (June 6, 1995).

76.     Additionally, Section 48950(a) of the Education Code states in relevant part, "A school district operating one or more high schools . . . shall not make or enforce a rule subjecting a high school pupil to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when

11

1 engaged in outside of the campus, is protected from governmental restriction by the First Amendment to

2 the United States Constitution or Section 2 of Article I of the California Constitution."

3 77.    "[H]igh school students are more likely to be chilled by a school's display of authority" because

4 they are "still developing self-confidence and intellectual independence, still subject to peer pressure and

5 more likely to be intimidated by authority." *Smith v. Novato Unified Sch. Dist.*, 150 Cal. App. 4th 1439,

6 1464 (2007), *as modified* (June 20, 2007).

7

## Statement of Facts

9 78.    Marielle is a Senior at Eagle Rock School within the LAUSD.

10 79.    Eagle Rock School participates in the NSLP.

11 80.    On February 8, 2023, Marielle emailed Defendant Steinorth, seeking permission to participate in

12 a day of action on April 14, 2023, to "educate students about the health and equity problems associated

13 with serving dairy milk in schools." Marielle stated that she aimed to table in the quad during lunch to

14 distribute educational materials; the materials would describe:

15     a.   the relationship between dairy and heart disease and cancer;

16     b.   issues of equity around dairy's disproportionate negative health impacts on students of

17         color;

18     c.   the burdensome process for requesting a substitute for dairy milk;

19     d.   the ways in which schools pressure students to drink dairy milk;

20     e.   the ways in which schools are used as a marketing arm for the dairy industry; and

21     f.   the harm to the environment and animals caused by the dairy industry.[1]

---

[1] In addition to being constitutionally protected, the veracity of Marielle's speech is supported by substantial evidence. Fluid milk is one of the top sources of saturated fat and cholesterol in the American diet. Nat'l Cancer Inst., Nat'l Inst. of Health ("NIH"), Identification of Top Food Sources of Various Dietary Components 38, 46 (2019), https://epi.grants.cancer.gov/diet/foodsources/top-food-sources-report-02212020.pdf. Lactose, the sugar omnipresent in fluid milk, is indigestible in individuals lacking the lactase enzyme. NIH, NIH Consensus Development Conference: Lactose Intolerance and Health 35 (2010) (hereinafter "NIH Consensus Report"), https://consensus.nih.gov/2010/images/lactose/lactose_abstracts.pdf. This is the case for many people of color, as described below, resulting in diarrhea, pain, and other, sometimes serious, digestive symptoms. *Id.* at 35–36. One major environmental effect of fluid milk consumption is the production of methane, a potent greenhouse gas,

81.     To be certain that providing literature critical of dairy would not subject her to discipline, Marielle inquired in the February 8 email as to whether "a student-led event discouraging the consumption of dairy milk in schools" would violate the NSLP requirement that "a school that participates in the school lunch program . . . shall not directly or indirectly restrict the sale or marketing of fluid milk products by the school (or by a person approved by the school) at any time or any place— on the school premises; or at any school-sponsored event."

82.     Marielle requested that Defendant Steinorth notify her by March 1, 2023, whether she had permission to disseminate the materials.

83.     On February 15, 2023, Defendant Steinorth asked to meet with Marielle to discuss her proposal as he had "a couple concerns."

84.     On March 3, 2023, Defendant Steinorth met with Marielle, and she reiterated her fear that she might be punished for distributing materials critical of dairy directly outside the cafeteria. Defendant Steinorth stated that he would have to speak about the matter with his District supervisor before he could provide Marielle with a final answer as to whether she had permission to disseminate materials critical of dairy.

85.     On March 13, 2023, not having heard back from Defendant Steinorth, Marielle followed up with an additional email to see whether Defendant Steinorth had spoken yet with his LAUSD supervisor.

86.     On March 14, 2023, Defendant Steinorth emailed Marielle to update her that, after speaking with his District supervisor and the Cafeteria Branch, they had decided as follows:

> You can have a table set up outside at lunch with her flyers on the pros and cons of drinking milk, but you should also have some literature for both sides of the debate. I am trying to get some from a LAUSD nutritionist so that burden does not fall only on you... . You should not disrupt or interrupt students from getting meals for the day.

87.     Defendant Steinorth added, "I don't think [these restrictions are] too unreasonable."

---

by cattle herds used for its production. U.S. Envtl. Prot. Agency, Inventory of U.S. Greenhouse Gas Emissions and Sinks 5-1 to 5-4 (2018), https://www.epa.gov/sites/production/files/2020-04/documents/us-ghg-inventory-2020-main-text.pdf.

88.     On March 15, 2023, Marielle responded via email to Defendant Steinorth, agreeing that she would "absolutely make it clear to all of our students participating that we are not allowed to disrupt or interrupt students getting meals," further clarifying that "our intention is simply to raise awareness in a peaceful manner." Marielle did note, however that if "sharing materials that promote dairy [is] required in order for [] to proceed with the event . . . [w]e would not do the event." Marielle requested that Defendant Steinorth let her know "as soon as possible" whether she could proceed with the day of action as the Awareness Club was "already in the planning stages of the event."

89.     Defendant Steinorth failed to reply.

90.     On March 24, 2023, Marielle sent another email to Defendant Steinorth, reiterating that if distributing "pro-milk literature information is mandatory," the Awareness Club would not hold the event. She repeated her request that Defendant Steinorth make a decision as soon as possible, as the day of action was drawing near and she needed sufficient time to organize the event.

91.     Notwithstanding Marielle's clear communication that she would not distribute Dairy Promotions, on March 24, 2023, Defendant Steinorth sent Marielle the LAUSD-approved Dairy Promotions that she would be required to distribute in conjunction with materials critical of dairy. The LAUSD-approved Dairy Promotions were produced by The Dairy Alliance, The National Dairy Council, and New England Dairy.

92.     On March 27, 2023, Marielle emailed Defendant Steinorth explaining that "the point of this campaign is to counter industry-funded misinformation on dairy, and those flyers you provided fall into that category. Handing those out at the same time would defeat the purpose of our event." Once again, Marielle emphasized that she needed a final decision on whether the event could go forward without sharing Dairy Promotions, as the date of the event was fast approaching, and the Awareness Club needed a final answer for planning purposes.

93.     Defendant Steinorth did not reply to Marielle's email.

94.     On April 10, 2023, still hoping that her group might proceed with the event, Marielle emailed Defendant Steinorth again.

95.     Defendant Steinorth did not reply to Marielle's follow-up email, so Marielle sent one final email:

> Good morning Mr. Steinorth,
> As the day of action is approaching, you have said twice that I must include pro-dairy content. My understanding as of now is that I cannot go forward with my tabling event unless I provide pro-dairy content as well. If I am incorrect or misunderstanding this in any way, please me know by Thursday at the latest, as this Friday is the date I had scheduled in my initial email to you two months ago. I would like to begin setting up for this event as soon as possible, but at the same time do not want to break any rules. I understand that you are busy, but if I don't hear back before this Friday, I'm going to assume the answer is no.
> Thank you and I appreciate your time,
> Marielle Williamson

96.     On April 13, 2023, the day before Marielle's event, Defendant Steinorth finally emailed back: "Marielle, I'm sorry. I was asked to make sure that those materials were available as well. I completely understand your point though."

97.     Under Eagle Rock School's "Referral Policy," students are subject to discipline, including "detention," for "fail[ing] to comply with [] school rules."

98.     Because District Defendants confirmed that they had made and/or enforced a rule prohibiting Marielle from engaging in speech critical of dairy on schoolgrounds without simultaneously distributing Dairy Promotions, Marielle could not proceed with the event without being subject to discipline.

99.     Notwithstanding District Defendants' insistence that student speech critical of dairy must be accompanied by speech promoting dairy, District Defendants regularly permit, approve, and promote speech that advocates for just one side of a debate. As to speech regarding dairy in particular, there is an egregious double standard: *speech that promotes dairy at school need not be accompanied by speech that provides the opposing viewpoint critical of dairy.*

100.    District Defendants previously encouraged LAUSD student participation in the California Milk Processor Board's "Breakfast Challenge," through which students compete to increase breakfast participation with milk, including through student creation and/or distribution of Dairy Promotions such as handouts and posters.

101.    During Marielle's years at Eagle Rock School, "Got Milk" posters have consistently hung in the hallways. Every day of the schoolyear, the student announcements over the intercom include the "Got

Milk" slogan in describing the day's menu. The menus themselves include the phrase "Got Milk" for each and every meal.

102.    Nor do District Defendants require that students provide materials from both sides of the debate outside of the milk context. Following the tragic February 14, 2018, shooting at Marjory Stoneman Douglas High School in Parkland, Florida, students throughout LAUSD led on-campus assemblies and forums to speak and share materials in support of gun control.

103.    On information and belief, LAUSD did not require that students present "both sides of the debate," during any of these actions in support of gun control, nor were any students required to simultaneously provide materials in support of gun use from gun lobbies such as the National Rifle Association.

104.    On information and belief, District Defendants formally (via a written guideline and/or memorandum), or informally (via *ad hoc* application whenever they learn about dairy-related speech), enforce the Milk Marketing Protections to prevent students from engaging in free speech activities that criticize dairy. Whether the Milk Marketing Protections were originally intended to be so restrictive of speech is uncertain, however, the language is vague enough that other state agents, and even USDA representatives (as discussed *supra*), have stated that displaying any materials at school that may lessen the likelihood of students choosing dairy violates the Milk Marketing Protections.

**First Cause of Action**
**Infringement of Freedom of Speech**
**Viewpoint Discrimination**
**First and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983)**
**(Plaintiffs Against District Defendants)**

105.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth fully herein

106.    District Defendants prohibited Plaintiff Williamson from distributing literature critical of dairy to fellow students during lunchtime unless she agreed to simultaneously distribute Dairy Promotions that she sought to refute. District Defendants did so notwithstanding that Plaintiff Williamson had readily agreed not to disrupt or interrupt students getting meals and communicated that the intention of the event

was "simply to raise awareness in a peaceful manner."

107.    Defendants violated Plaintiff Williamson's right to freedom of speech under the First and Fourteenth Amendments to the United States Constitution by prohibiting Plaintiff Williamson from distributing literature critical of dairy to fellow students during lunchtime since she would not agree to simultaneously distribute the Dairy Promotions that she sought to refute.

108.    While District Defendants regularly permit, approve, and promote speech that advocates for just one side of a debate, *inclusive of speech that promotes dairy*, District Defendants nonetheless required that Plaintiff Williamson's speech critical of dairy must be accompanied by speech that promotes dairy.

109.    "[T]he First Amendment forbids the government [from regulating] speech in ways that favor some viewpoints or ideas at the expense of others." *Members of the City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

110.    District Defendants' application of the Milk Marketing Protections to restrict Plaintiff Williamson's speech, as directed by Defendant Steinorth's District Supervisor and the District Cafeteria Branch, is unreasonable and constitutes viewpoint discrimination in violation of the First and Fourteenth Amendments to the United States Constitution.

111.    District Defendants' actions constitute a prior restraint on Plaintiff Williamson's speech.

112.    Plaintiff Williamson has suffered and will continue to suffer irreparable harm and the deprivation of her rights because of District Defendants' unconstitutional actions.

113.    The Awareness Club's members and the Physicians Committee's student members have suffered, and reasonably expect to suffer, violations of their free expression rights, given District Defendants' unlawful restriction of speech critical of dairy.

**<u>Second Cause of Action</u>**
**Infringement of Freedom of Speech**
**Compelled Speech**
**First and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983)**
**(Plaintiffs Against District Defendants)**

114.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

115.   "'Since *all* speech inherently involves choices of what to say and what to leave unsaid,' one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (emphasis in original), citing *Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality opinion).

116.   Outside the context of commercial advertising, the state "may not compel affirmance of a belief with which the speaker disagrees." *Hurley*, 515 U.S. at 573.

117.   By attempting to compel Plaintiff Williamson to distribute Dairy Promotions that she sought to refute, District Defendants' application of the Milk Marketing Protections to Plaintiff Williamson's speech – as directed by Defendant Steinorth's District Supervisor and the District Cafeteria Branch – violated Plaintiff Williamson's right to freedom of speech under the First and Fourteenth Amendments to the United States Constitution.

118.   Indeed, far from "reasonable restrictions" as characterized by Defendant Steinorth, District Defendants' attempt to compel Plaintiff Williamson "to affirm in one breath" her approval of the dairy industry, "which [she would] deny in the next," constitutes a blatant violation of Marielle's free speech rights. *Pacific Gas & Electric Co.,* 475 U.S. at 16.

119.   District Defendants' actions constitute a prior restraint on Marielle's speech.

120.   Marielle has suffered and will continue to suffer irreparable harm and the deprivation of her rights because of District Defendants' unconstitutional actions.

121.   The Awareness Club's members and the Physicians Committee's student members have suffered, and reasonably expect to suffer, violations of their free expression rights, given District Defendants' unlawful restriction of speech critical of dairy.

**Third Cause of Action**
**Compelled Speech; Viewpoint Discrimination**
**California Constitution, Article I, § 2; Cal. Educ. Code § 48907**
**(Plaintiffs Against District Defendants)**

122.   Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

123.   In considering a free speech claim under the California Constitution, courts "begin with the

18

unquestioned proposition that the California Constitution is an independent document and its constitutional protections are separate from and not dependent upon the federal Constitution . . . ." *Los Angeles All for Survival v. City of Los Angeles*, 22 Cal. 4th 352, 365 (2000).

124.   "The California Constitution's free speech provision is 'at least as broad' as and in some ways is broader than the comparable provision of the federal Constitution's First Amendment." *Kasky v. Nike, Inc.* 27 Cal.4th 939, 958–959 (2002); *see also Gerawan Farming, Inc. v. Lyons,* 24 Cal. 4th 468*,* 511–13 (2000) (discussing, in a compelled speech case, the broad language of California's free speech clause as a persuasive reason not to follow federal First Amendment precedent).

125.   Unlike the First Amendment, California's free speech clause "specifies a 'right' to freedom of speech explicitly and not merely by implication," "runs against . . . private parties as well as governmental actors" and expressly "embrace[s] all subjects." *Gerawan Farming*, 24 Cal. 4th at 491.

126.   Section 48907 of the California Education code provides greater freedom of speech protections than those guaranteed by the First Amendment and federal case law. *Lopez v. Tulare Joint Union High Sch. Dist.*, 34 Cal. App. 4th 1302, 1317 (1995), *as modified* (June 6, 1995).

127.   "[T]he right to free speech protects not only the content but the dissemination and circulation of the material as well." *Bright v. Los Angeles Unified Sch. Dist.*, 18 Cal. 3d 450, 466 (1976).

128.   Despite Marielle having readily agreed not to disrupt student meals, and her having communicated that the intention of the event was "simply to raise awareness in a peaceful manner," District Defendants prohibited Marielle from distributing literature reflecting her viewpoints during lunchtime.

129.   While District Defendants regularly permit, approve, and promote speech that advocates for just one side of a debate, *inclusive of speech that promotes dairy*, District Defendants nonetheless required that Plaintiff Williamson's speech critical of dairy must be accompanied by speech that promotes dairy.

130.   By attempting to compel Plaintiff Williamson to distribute materials antithetical to the message she aimed to express, District Defendants' application and interpretation of the Milk Marketing Protections to Plaintiff Williamson's speech – as directed by Defendant Steinorth's District Supervisor and the District Cafeteria Branch – violated Plaintiff Williamson's right to freedom of speech under Article I, Section 2 of the California Constitution, and Section 48907 of the California Education Code.

*See U.S. W. Falun Dafa Assn. v. Chinese Chamber of Com.*, 163 Cal. App. 4th 590, 599 (2008).

131.     District Defendants' application and interpretation of the Milk Marketing Protections to Plaintiff Williamson's speech, as directed by Defendant Steinorth's District Supervisor and the District Cafeteria Branch, is unreasonable and constitutes viewpoint discrimination in violation of Section 2 of the California Constitution and Section 48907 of the California Education Code.

132.     District Defendants' actions constitute a prior restraint on Plaintiff Williamson's speech.

133.     Plaintiff Williamson has suffered and will continue to suffer irreparable harm and the deprivation of her rights because of Defendants' unconstitutional actions.

134.     The Awareness Club's student members and the Physicians Committee's student members have suffered, and reasonably expect to suffer, violations of their free expression rights, given District Defendants' unlawful restriction of speech critical of dairy.

**Fourth Cause of Action**
**Cal. Educ. Code § 48950**
**(Plaintiff Williamson Against District Defendants)**

135.     Section 48950(a) of the Education Code establishes that a school district "shall not make or enforce a rule subjecting a high school pupil to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when engaged in outside of the campus, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution."

136.     Under Eagle Rock School "Referral Policy," students are subject to discipline, including "detention," for "fail[ing] to comply with [] school rules."[2]

137.     Because District Defendants "made or enforced a rule" that "subject[s]" Plaintiff Williamson to "disciplinary sanctions" for engaging in First Amendment protected speech, District Defendants violated Education Code § 48950.

138.     Under Section 48950(b), "[a] pupil who is enrolled in a school at the time that the school has made or enforced a rule in violation of subdivision (a) may commence a civil action to obtain appropriate injunctive and declaratory relief as determined by the court."

---

[2] Eagle Rock School, Policies (2021), https://erhs.la/students/policies.

139.    As a student at Eagle Rock School at the time that District Defendants "made or enforced" the unlawful rule restricting her protected speech, Section 48950(b) allows Plaintiff Williamson to continue this civil action even after she graduates.

**Fifth Cause of Action**
**Vagueness**
**First Amendment (42 U.S.C. § 1983)**
**(Against District Defendants as Applied; Facially Against Defendant USDA)**

140.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

141.    Both facially and as applied, the Milk Marketing Protections are unconstitutionally vague.

142.    The Milk Marketing Protections are not clearly defined such that a person of ordinary intelligence can readily determine what is prohibited.

143.    Persons of ordinary intelligence may not readily determine what is meant by the phrase "indirectly restrict," i.e., whether student speech critical of dairy on school premises "indirectly restricts" the sale or marketing of fluid milk in violation of the Milk Marketing Protections; whether a school that permits a student to engage in speech critical of the dairy industry in the school cafeteria has in fact "indirectly restricted" the sale or marketing of fluid milk; or whether a school that develops an educational curriculum critical of dairy has in fact "indirectly" restricted the sale or marketing of fluid milk.

144.    "If [a]statute, judged on its face and as applied [], is void for vagueness, access may not be had to the legislative history in order to establish its meaning." *Fleuti v. Rosenberg*, 302 F.2d 652, 654–55 (9th Cir. 1962).

145.    "Congress has wide latitude to attach conditions to the receipt of federal assistance to further its policy objectives [citation omitted]. But Congress may not 'induce' the recipient to engage in activities that would themselves be unconstitutional." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 203 (2003).

146.    The vagueness of the Milk Marketing Protections as applied to Marielle's speech has induced District Defendants to violate Marielle's First Amendment right to free speech.

147.     As a result of the vagueness of the Milk Marketing Protections, the speech of the Physicians Committee's student members is objectively chilled by a reasonable fear that that engaging in speech critical of dairy on schoolgrounds will result in punitive action taken against them by their respective school districts in violation of the First and Fourteenth Amendments to the United States Constitution.

148.     As a result of the vagueness of the Milk Marketing Protections, third party students at schools that participate in the NSLP have suffered a violation of their First Amendment right to receive information and ideas on schoolgrounds from their peers during noninstructional time, inclusive of materials critical of dairy, although such materials are neither lewd nor in any way likely to cause a substantial disruption to school operations.

149.     As a result of the vagueness of the Milk Marketing Protections, third party teachers and administrators at schools that participate in the NSLP are objectively chilled by a reasonable fear that engaging in speech critical of dairy on school grounds, inclusive of curricula, will result in punitive actions taken against them by their respective school districts, or against their school districts, by Defendant USDA in violation of the First and Fourteenth Amendments to the United States Constitution.

150.     Accordingly, the Milk Marketing Protections are facially invalid and should be struck down.

151.     Plaintiffs have no other adequate remedy at law and have already suffered as a result of having their speech restricted and will continue to suffer in the future.

### Sixth Cause of Action
**Overbreadth**
**First Amendment (42 U.S.C. § 1983)**
**(Plaintiffs Against Defendant USDA)**

152.     Plaintiffs incorporate by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

153.     The Milk Marketing Protections violate the First Amendment because they are overbroad.

154.     The Milk Marketing Protections suppress a substantial amount of protected speech compared to any legitimate sweep, including student speech critical of dairy, teacher and administrator speech critical of dairy, and charitable organizations' speech critical of dairy.

155.     According to at least one state agency tasked with administering the NSLP, the Milk Marketing Protections forbid schools from distributing educational materials about the negative impacts of dairy consumption well beyond the lunch line, i.e., "at any time or any place—on the school premises; or at any school-sponsored event," inclusive of educational curricula and instruction.

156.     The Supreme Court has historically stricken restrictions on the free flow of knowledge and learning, including restrictions on what can and cannot be taught, commenting that "[t]eachers and students must always remain free to inquire, to study and to evaluate . . . ." *Sweezy v. N.H.*, 354 U.S. 234, 250 (1957).

157.     Schools and school districts in California, including public schools and districts, possess free speech rights, including academic freedom concerning classroom content and method.

158.     While schools have no constitutional right to the benefits of participating in government programs, Congress does not have the authority to attach "conditions that seek to leverage funding to regulate speech *outside the contours of the program itself.*" *Agency for Int'l Dev.,* 570 U.S. at 213.

159.     Given the substantial overbreadth of the Milk Marketing Protections relative to any legitimate sweep, including their suppression of the protected speech of students, teachers, administrators, schools, and charitable organizations, the Milk Marketing Protections are facially invalid and should be struck down.

160.     Plaintiffs have no other adequate remedy at law and have already suffered as a result of having their speech restricted and will continue to suffer in the future.

**Requested Relief**

Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

      a.  A declaratory judgment that District Defendants violated, and are violating, Plaintiff Williamson's rights under the First and Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the California Constitution; and Sections 48907 and 48950 of the California Education Code;

b.  A declaratory judgment that District Defendants' free speech restrictions, based on the Milk Marketing Protections, are unconstitutional as applied to Plaintiff Williamson's proposed distribution of materials critical of dairy on schoolgrounds under the First and Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the California Constitution;

c.  A declaratory judgment that the Milk Marketing Protections are unconstitutional as applied to Plaintiff Williamson's speech critical of dairy under the First and Fourteenth Amendments to the United States Constitution;

d.  A declaratory judgment that the Milk Marketing Protections are facially unconstitutional under the First Amendment to the United States Constitution;

e.  A preliminary and permanent injunction ordering District Defendants to permit students in LAUSD to distribute literature critical of dairy on schoolgrounds during noninstructional time absent a corresponding requirement that those students also distribute literature that promotes dairy;

f.  An entry of judgment for Plaintiff Williamson for nominal damages of $1 against District Defendants in their individual capacities;

g.  Plaintiffs' costs and reasonable attorneys' fees in this action; and

h.  All other further relief as the Court deems appropriate.

Dated: May 2, 2023

By:   /s/ Corey Page
Corey Page
Geneva Page
Matthew Hamity

*Attorneys for Plaintiffs*